PAUL D. SCOTT, ESQ.
California State Bar # 145975
LANI ANNE REMICK, ESQ.
California State Bar # 189889
LAW OFFICES OF PAUL D. SCOTT
505 Sansome Street, Sixth Floor
San Francisco, California 94111
Tel: (415) 981-1212
Fax: (415) 981-1215
Attorneys for Relator Douglas Farrow

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 6 2009

CENTRAL DISTRICT OF CALIFORNIA
ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA ex rel.
DOUGLAS FARROW; STATE OF CALIFORNIA
ex rel. DOUGLAS FARROW; STATE OF
FLORIDA ex rel. DOUGLAS FARROW,

Plaintiffs,

vs.

TRELLEBORG, AB (aka Trelleborg Group);
TRELLEBORG ENGINEERED SYSTEMS;
FENTEK MARINE SYSTEMS GmbH;
TRELLEBORG ENGINEERED PRODUCTS,
INC.; TRELLEBORG INDUSTRIE SAS;
VIRGINIA HARBOR SERVICES, INC.,
SEAWARD INTERNATIONAL INC; SEAWARD
HOLDINGS, INC.; NEXTWAVE MARINE, LLC;
MARINE FENDERS INTERNATIONAL, INC.;
WATERMAN SUPPLY COMPANY, INC.;
PLASTIC PILINGS, INC.; MARITIME
INTERNATIONAL; SEYMOUR WATERMAN;
FRANK MARCH; ROBERT TAYLOR; GERALD
THERMOS; JOHN DEATS; ANDREW
BARMAKIAN; TOMAS CRAWAAK; LARRY
LIZOTTE; PROMAR; YOKOHAMA RUBBER
COMPANY, LTD.; FENDERCARE NAVAL
SOLUTIONS; FENDERCARE MARINE
SOLUTIONS; JAMES FISHER PLC; DONALD
MURRAY; PETER NILSSON; WILLIAM ALAN
POTTS; DUNLOP OIL AND MARINE, LTD.;
PHOENIX AG; CONTINENTAL AG; MANULI
RUBBER INDUSTRIES SPA; MANULI OIL &

CASE NO.

ED-CV-05-381  GHW (SGLx)

**FIFTH AMENDED
COMPLAINT**

**DEMAND FOR JURY TRIAL**

**FILED UNDER SEAL**

1

MARINE (USA); ITR, S.P.A.; SAIAG, S.P.A.;        )
COMITAL SAIGA, S.P.A.; PARKER ITR S.R.L.;        )
ITR RUBBER S.R.L.; PARKER HANNIFIN               )
CORPORATION; BRIDGESTONE INDUSTRIAL              )
PRODUCTS AMERICA, INC.; BRIDGESTONE              )
CORPORATION; SUMITOMO RUBBER                     )
INDUSTRIES, LTD., SRI HYBRID LTD., and           )
DOES 31-50.                                      )
                                                 )
                                                 )
              Defendants                         )
_____)

## I. JURISDICTION AND VENUE

1.      This action is brought under the False Claims Act ("FCA" or "Act"), 31 U.S.C.

§ 3729 et seq., by plaintiff/relator Douglas Farrow ("relator") on behalf of the United States of

America, under the qui tam provisions of the Act.  The case also includes pendent state law

claims for violations of the California False Claims Act ("State False Claims Act"), Gov. Code

§ 12650 et seq., and the Florida False Claims Act §§ 68.081 - 68.092, Florida Statutes, both of

which permit interested persons to bring civil actions on behalf of the respective states.

2.      This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C.

§ 1345, for the United States is a party to this matter and the causes of action set forth herein are

founded upon a law of the United States of America.

3.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732,

for the defendants conduct business in this District where indicated below, and a substantial part

of the events or omissions giving rise to the claims occurred in this District.  Venue also lies

under 28 U.S.C. § 1391(c) as the False Claims Act provides for nationwide service of process.

31 U.S.C. § 3732(a).

## II. INTRODUCTION

4.      This amended complaint alleges four related schemes involving marine products.

The first scheme involves bid-rigging/price-fixing/market allocation that has resulted in excess

prices being charged to government programs/agencies for marine fenders and buoys. The second scheme involves allegations of a similar bid-rigging/price-fixing/market allocation arrangement relating to plastic pilings and related products. The third scheme involves false certifications as to business size. The fourth scheme involves a bid-rigging/price-fixing/market allocation arrangement relating to marine hoses.

5.      Relator is informed and believes that the bid-rigging/price-fixing/market-allocation schemes described herein were all part of a larger pattern and practice of bid-rigging/price-fixing/market-allocation by certain of the companies named herein. Relator is further informed and believes that the pattern and practice of bid-rigging/price-fixing/market-allocation described herein also involved additional companies, distributors, products and federal government programs beyond those specifically mentioned in this Complaint, and that it took place during a period greater than that set forth for the specific schemes described herein. Relator is further informed and believes that the pattern of misrepresenting business size described herein by entities related to Trelleborg AB also involved additional Trelleborg AB companies and products beyond those specifically identified in this complaint and that it took place during a period greater than that set forth for the specific misconduct described herein.

### III. PARTIES

6.      Defendant Trelleborg AB (aka Trelleborg Group) ("Trelleborg") is a business organization of unknown type, with headquarters in Trelleborg, Sweden and business operations at locations across the world, including the United States and Germany.

7.      Defendant Trelleborg Engineered Systems ("TES") is a business organization of unknown type owned by Trelleborg. Relator is informed and believes that TES is a division of Trelleborg and has operations in the United States. Trelleborg has had knowledge of TES's wrongful conduct described herein and authorized and directed such conduct.

8.      Defendant Trelleborg Engineered Products, Inc. ("TEP") is a corporation with headquarters located at 3470 Martinsburg Pike, Clearbrook, Virginia 22624. Relator is informed and believes that TEP falls within the TES division of Trelleborg and is a wholly owned subsidiary of Trelleborg. During the period relevant to this complaint, defendant TEP has

conducted business in this district in the City of Wilmington, California. At all times relevant to this complaint, TEP has been dominated and controlled by Trelleborg. TES and Trelleborg have had knowledge of TEP's wrongful conduct described herein and authorized and directed such conduct. During the period relevant to this complaint, the board members of TEP have included Peter Nilsson, Robert Taylor, Tomas Crawaak, Don Murray, and Adam Bloomenstein. Relator is informed and believes that TEP recently changed its name to Virginia Harbor Services, Inc. ("VHSI").

9.      Defendant Fentek Marine Systems GmbH ("Fentek") is a business organization of unknown type with its headquarters in Hamburg, Germany and offices at different locations across the world including an office in the State of Virginia. Relator is informed and believes that Fentek falls within the TES division of Trelleborg and is a wholly owned business unit of Trelleborg. Trelleborg's website lists Fentek as one of the business areas of TES. Since approximately 2001, Fentek has been dominated and controlled by Trelleborg. Between at least approximately 2001 through 2006, Tomas Crawaak was the company's president. Relator is informed and believes that prior to 2001, Tomas Crawaak was the principal owner and operator of Fentek. Fentek has conducted business in this district, via its President Tomas Crawaak, during the time period relevant to this complaint. Relator is informed and believes that TES and Trelleborg have had knowledge of Fentek's wrongful conduct described herein, and that both authorized and directed such conduct.

10.      Defendant Seaward International Inc. ("SII") is a corporation organized under the laws of the State of Virginia with offices located in Clearbrook, Virginia.

11.      Defendant Seaward Holdings, Inc. ("SHI") is a corporation organized under the laws of the State of Virginia, with offices located in Clearbrook, Virginia. Relator is informed and believes that SHI acquired SII in 1999 and that SHI dominates and controls SII. The name "Seaward" herein refers to SHI and SII, both of which have conducted business at times relevant to this complaint in this district in Bellflower, California. Relator is informed and believes that most of SHI's assets and operations, including the Seaward fender and buoy manufacturing

4

operation, were acquired by Trelleborg in approximately December 2002 and are now run by TEP.

12.     Defendant Frank March is an individual whose present place of residence is unknown to relator. Relator is informed and believes that defendant March is the majority shareholder of SHI, that he was the majority shareholder of SII before it was acquired by SHI, and that he has been the alter ego of SII and SHI, respectively, during the time period relevant to this complaint. Defendant Frank March directed and authorized the wrongful conduct by Seaward described herein, including misconduct within this district. In or around December 2002, defendant March authorized the sale of Seaward's operations to Trelleborg (or one of its business units) for, on information and belief, approximately $10 million. Relator is informed and believes that funds earned through the wrongful conduct described herein have been distributed to the shareholders of Seaward, including its majority owner Frank March, and that Seaward is now undercapitalized to such an extent that it will be unable to pay a judgment against it arising from the misconduct described herein.

13.     Defendant Robert (aka "Bob") B. Taylor is an individual whose present place of residence is unknown. Between 1997 and 1998, Robert Taylor was the principal owner and operator of ProMar. In 1999, ProMar was acquired by SHI. Robert Taylor thereafter served as President of SHI and held a minority interest in SHI. In or around December 2002, Trelleborg acquired certain of SHI's assets and operations, including the Seaward fender and buoy manufacturing operation. Relator is informed and believes that Taylor granted his authorization to the sale. Following the acquisition of SHI's operations by Trelleborg/TEP, Robert Taylor was employed as the President of TEP and sat on its board. Defendant Taylor, like defendant March, directed, authorized and participated in the wrongful conduct by Seaward described herein, including misconduct in this district. Defendant Taylor authorized and directed TEP to continue engaging in the wrongful practices described herein after Trelleborg/TEP acquired Seaward's operations.

14.     Defendant Nextwave Marine LLC. is a business organization of unknown type formed in June 2001 by UPC and SHI, with offices located at 521 North Sam Houston Parkway

East, Houston, Texas 77060.   Between at least June 2001 and December 2002, defendant
Nextwave acted as an agent of Seaward with respect to the wrongful conduct described herein.

15.     Defendant Marine Fenders International, Inc. ("MFI") is a corporation organized
under the laws of the State of California by Gerald Thermos, with offices located at 909 Mahar
Avenue, Wilmington, California 90744.

16.     Defendant Gerald Thermos is an individual presently residing in the State of
California.  Defendant Thermos is the former president of Urethane Products Corporation
("UPC") and now owns and operates MFI in Wilmington, California.   Defendant Thermos
dominates and controls MFI and is its alter ego.

17.     Defendant Waterman Supply Company, Inc. ("WSC") is a corporation organized
under the laws of the State of California with offices located at 910 Mahar Avenue, Wilmington,
California 90744.

18.     Defendant Seymour Waterman is an individual who conducts business in the City
of Wilmington, California.  Relator is informed and believes that, at all times relevant to this
complaint, Mr. Waterman has been and is the principal owner of WSC and that he directed and
authorized the wrongful conduct by that entity described herein.

19.     Defendant Plastic Pilings, Inc. ("PPI") is a corporation organized under the laws
of the State of California with offices located in Rialto, California.

20.     Defendant Andrew Barmakian is an individual who conducts business in Rialto,
California.  Relator is informed and believes defendant Barmakian is the owner and president of
PPI.  Defendant Barmakian directed and authorized the wrongful conduct by PPI described
herein.

21.     Defendant Maritime International, Inc. ("Maritime International") is a corporation
incorporated under the laws of Louisiana, which conducted business in this district during the
time period relevant to this complaint.

22.     Defendant John Deats is an individual who has conducted business in this district
during the time period relevant to this complaint.  Relator is informed and believes that

defendant Deats is the owner of Maritime International. Defendant Deats directed and authorized the wrongful conduct by Maritime International described herein.

23.     Defendant Tomas Crawaak was a board member of TEP during the period of the events described in this Complaint. As noted above, Mr. Crawaak was also the President of Fentek, which falls within the TES division of Trelleborg. Relator is informed and believes that Mr. Crawaak held the foregoing positions during the time period relevant to this complaint. Mr. Crawaak resides in Germany but has conducted business in this district during the period relevant to this complaint, including the misconduct described herein.

24.     Defendant Larry Lizotte is an individual who was employed as a manager by UPC at its facility in Bellflower, California during the time period relevant to this complaint.

25.     Defendant ProMar (aka ProMar LLC or ProMar Corp) is a business entity of unknown type with offices located in Clearwater, Virginia, and offices formerly located in Kearneysville, West Virginia and Fort Worth, Texas.

26.     Defendant Yokohama Rubber Company, Ltd. ("Yokohama") is a business entity of unknown type with offices located in Tokyo, Japan. Relator is informed and believes that Yokohama has conducted business in this district during the period relevant to this complaint and had an office in Fullerton, California.

27.     Defendant FenderCare Naval Solutions Limited is a business entity of unknown type organized under the laws of the United Kingdom, which has conducted business in the United States during the time period relevant to this complaint. Relator is informed and believes that FenderCare Naval Solutions has conducted business in and/or impacting this district during the period relevant to this complaint. Relator is informed and believes that FenderCare Naval Solutions is a limited liability company, which is essentially equivalent in form to a corporation under the laws of the United States. FenderCare Naval Solutions Limited is based in Norfolk, Great Britain.

28.     Defendant FenderCare Marine Solutions Limited is a business entity of unknown type that acts as a holding company for a variety of business entities, including FenderCare Naval Solutions Limited. Relator is informed and believes that FenderCare Marine Solutions

7

Limited is a limited liability company, which is essentially equivalent in form to a corporation under the laws of the United States.  FenderCare Marine Solutions Limited is based in Norfolk, Great Britain.  Relator is informed and believes that FenderCare Marine Solutions has been the sole shareholder of FenderCare Naval Solutions during the period relevant to this complaint. Relator is informed and believes that FendCare Marine Solutions dominates and controls FenderCare Naval Solutions.

29.     Defendant James Fisher PLC is a public liability company formed under the laws of the United Kingdom.  In March 2005, James Fisher PLC acquired the shares of FenderCare Marine Solutions (and thus FenderCare Naval Solutions).    Relator is informed and believes that James Fischer PLC has dominated and controlled FenderCare Marine Solutions Limited since its acquisition of that company.  James Fisher PLC is based in Norfolk, Great Britain, but has conducted business in the United States via FenderCare Marine Solutions (and thus FenderCare Naval Solutions).  Through its acquisition of FenderCare Marine Solutions, James Fisher PLC has assumed the liabilities of that company.

30.     Defendant Trelleborg Industrie S.A.S. ("Trelleborg Industrie") is a subsidiary of Trelleborg based in France.  Trelleborg Industrie falls within the TES division of Trelleborg. Relator is informed and believes that TES and Trelleborg have had knowledge of Trelleborg Industrie's wrongful conduct described herein, and that both authorized and directed such conduct.  Trelleborg Industrie has conducted business in the United States during the period relevant to this complaint.   Relator is informed and believes that Trelleborg Industrie has conducted business in this district during the period relevant to the complaint.

31.     Defendant Virginia Harbor Services, Inc. is a business entity of unknown type with offices located at 3470 Martinsburg Pike, Clearbrook, Virginia 22624.  Relator is informed and believes that TEP recently changed its name to Virginia Harbor Services, Inc.  VHSI has conducted business in this district during the period relevant to this complaint

32.     Defendant Donald Murray is an individual who has conducted business in this district during the period relevant to this complaint.  Donald Murray was Chief Financial Officer ("CFO") of Seaward then moved into a similar position at TEP after the acquisition of Seaward's

operations by Trelleborg.   Mr. Murray also sat on the board of TEP during the period relevant to this complaint.

33.    Defendant Peter Nilsson is an individual who has conducted business in this district and/or impacting this district during the period relevant to this complaint.   Peter Nilsson is the current president of Trelleborg.  Mr. Nilsson was President of TES between approximately June 1, 2003 and October 1, 2005.  Prior to June 1, 2003, Mr. Nilsson was head of the Trelleborg Engineered Products business unit within TES.

34.    Defendant William Alan Potts is an individual who has conducted business in this district during the period relevant to this complaint.   Defendant Potts is the former CFO of TEP and held that position during the period relevant to this complaint.

35.    Defendant Dunlop Oil and Marine, Ltd., a manufacturer of marine hose products, is a business entity of unknown type organized and existing under the laws of the United Kingdom but which has conducted business in the United States during the period relevant to this complaint.  Relator is informed and believes that Dunlop Oil and Marine is owned and controlled by Contitech, a division of Continental AG.   Relator is informed and believes that Dunlop Oil and Marine has conducted business in and/or impacting this district during the period relevant to this complaint.

36.    Defendant Phoenix AG is an entity of unknown type which is based in Hamburg, Germany but which has conducted business in the United States during the period relevant to this complaint.  Relator is informed and believes that Phoenix AG is the former parent of Dunlop Oil and Marine.  Phoenix AG is owned by Contitech, a division of Continental AG.  Relator is informed and believes that Phoenix AG was acquired by Division Contitech of Continental AG in 2004.  Relator is informed and believes that Phoenix AG has conducted business in and/or impacting this district during the period relevant to this complaint.

37.    Defendant Continental AG is a business entity of unknown type which is based in Hannover Germany but which has conducted business directly or indirectly in the United States during the period relevant to this complaint.  Dunlop, Phoenix AG, Contitech, and Continental AG are collectively referred to herein as "Dunlop."  Relator is informed and believes that

9

Continental AG and Dunlop have conducted business in and/or impacting this district during the period relevant to this complaint.

38.     Defendant Manuli Rubber Industries SpA (hereinafter "Manuli Rubber"), a manufacturer of marine hose products, is a business entity of unknown type based in Italy but which has conducted business in the United States during the period relevant to this complaint. Relator is informed and believes that Manuli Rubber has conducted business in and/or impacting this district during the period relevant to this complaint.

39.     Defendant Manuli Oil & Marine (USA) Inc. was a Deleware corporation with its principal place of business in Ft. Lauderdale, Florida. It was a wholly owned subsidiary of Manuli Rubber Industries S.p.A. Manuli Oil & Marine and its parent Manuli Rubber Industries are referred to collectively herein as "Manuli." Relator is informed and believes that Manuli has conducted business in and/or impacting this district during the period relevant to this complaint.

40.     Defendant ITR, S.p.A,  was, at relevant times, a business entity of unknown type with its principal place of business in Veniano, Italy but which has conducted business in the United States during the period relevant to this complaint. Defendant ITR, S.p.A. was formed in or around 1990 by the merger of Pirelli Itala and Pirelli Treg. Defendant ITR, S.p.A. was originally a subsidiary of Pirelli, S.p.A., then it became a subsidiary of SAIAG, S.p.A., and then later it became a subsidiary of the Parker-Hannifen Corporation, where it was known as Parker ITR, S.r.l. and/or ITR Rubber S.r.l. Relator is informed and believes that ITR, S.p.A. has conducted business in and/or impacting this district during the period relevant to this complaint.

41.     Defendant SAIAG, S.p.A. is a business entity of unknown type with its principal place of business in Turin, Italy. Defendant SAIAG, S.p.A., at relevant times, was the parent of ITR, S.p.A. Relator is informed and believes that SAIG, S.p.A. has conducted business in and/or impacting this district during the period relevant to this complaint.

42.     Defendant Comital SAIGA, S.p.A. is a business entity of unknown type with its principal place of business in Turin, Italy. Defendant Comital SAIGA, S.p.A., at relevant times, was the parent corporation of SAIGA, S.p.A. and ITR. Relator is informed and believes that

Comital SAIG has conducted business in and/or impacting this district during the period relevant to this complaint.

43.   Defendant Parker ITR S.r.l. f/k/a ITR Rubber S.r.l., f/k/a ITR, S.p.A., is a business entity of unknown type based in Italy but which has conducted business as a manufacturer of marine hose products in the United States during the period relevant to this complaint.   Relator is informed and believes that Parker ITR S.r.l has conducted business in and/or impacting this district during the period relevant to this complaint.

44.   Defendant Parker Hannifin Corporation is a corporation organized under the laws of the State of Ohio with its principal place of business in Cleveland, Ohio.   Defendant Parker ITR S.r.l. is a subsidiary of Parker Hannifin Corporation.   Parker ITR S.r.l. and its prior d/b/as, along with its current and former, direct and indirect, parent companies, are collectively referred to herein as "Parker."   Relator is informed and believes that Parker has conducted business in and/or impacting this district during the period relevant to this complaint.

45.   Defendant Bridgestone Corporation, a manufacturer of marine hose and other products, is a business entity of unknown type based in Japan but which has conducted business in the United States during the period relevant to this complaint.   Relator is informed and believes that Bridgestone Corporation has conducted business in and/or impacting this district during the period relevant to this complaint.

46.   Defendant Bridgestone Industrial Products America, Inc. is a Delaware corporation with its principal place of business in Nashville, Tennessee.   Bridgestone Industrial Products America, Inc. is a subsidiary of BFS Diversified Products, LLC., which is a subsidiary of Bridgestone America Holdings, Inc., which is a subsidiary of Bridgestone Corporation.   The business entity Bridgestone Industrial Products America, Inc. along with its parent companies referenced above are collectively referred to herein as "Bridgestone."   Relator is informed and believes that Bridgestone has conducted business in and/or impacting this district during the period relevant to this complaint.

47.   Defendant Sumitomo Rubber Industries, Ltd. is a business entity of unknown type based in Kobo, Japan but which conducted business in the United States during the period

11

relevant to this complaint.   Relator is informed and believes that Sumitomo Rubber Industries Ltd. has conducted business in and/or impacting this district during the period relevant to this complaint.

48.   Defendant SRI Hybrid is a business entity of unknown type based in Kobo, Japan but which has conducted business in the United States during the period relevant to this complaint.   Relator is informed and believes that SRI Hybrid maintains an office in Los Angeles, California and that it has conducted business in and/or impacting this district during the period relevant to this complaint.  SRI Hybrid Ltd. is a subsidiary of Sumitomo Rubber Industries, Ltd.  Sumitomo Rubber Industries Ltd. and SRI Hybrid Ltd. are collectively referred to herein as "Sumitomo."

49.   The true names and capacities of the defendants named above as DOES 31 through 50, inclusive, are unknown to relator, who will seek leave of court to amend the complaint to allege the names and capacities of such defendants, together with any additional charging allegations, at such time as they are ascertained.

50.   Relator Douglas Farrow is a current member of the board of UPC.  Relator Farrow joined UPC in or around April 2004.  Through his work on UPC's board, his conversations with individuals involved in the misconduct described herein, his investigation of such matters, and his own review of UPC's records and other evidence, relator Farrow has direct and independent knowledge of the facts alleged herein, unless otherwise indicated.

51.   Unless otherwise indicated, this action by Mr. Farrow on behalf of the United States is not based upon a "public disclosure" as defined by 31 U.S.C. § 3730(e)(4)(A), and even if there were a public disclosure in this case, Mr. Farrow would qualify as an "original source" as defined by 31 U.S.C. § 3730(e)(4)(A).

### IV. FOAM-FILLLED FENDERS AND BUOYS

Gerald Thermos, UPC, Frank March, Robert Taylor, Seaward

52.   UPC was founded in 1976 by Timothy Thermos.   When he died in 1995, ownership of the company was transferred to his wife Elizabeth Thermos.   At or about the same

time, their son Gerald ("Jerry") Thermos took over as UPC's President, a capacity in which he continued to serve until approximately April 26, 2004.

53.     Between the mid 1990s and April 2004, Seaward (later TEP) and UPC were the dominant manufacturers in the United States of certain marine related products, including certain foam-filled fenders and buoys.

54.     In early 1999, Frank March and Gerald Thermos communicated regarding a consulting agreement, which March had presented to Thermos.  Relator is informed and believes that the draft consulting agreement proposed an arrangement between UPC and Seaward, by which the two would share information about bids and other information on pending projects. Thermos advised March in a February 1999 letter that he had been advised by UPC's antitrust counsel that the agreement was not acceptable.  He indicated that "UPC cannot and will not discuss with you, any information concerning the pricing, terms or conditions of any bid, or our decision as to whether or not we intend to bid on a particular project."

55.     Notwithstanding Thermos' February 1999 letter, discussions between the parties resumed thereafter.  In June 2000, Mr. Thermos met with, inter alia, Frank March and Robert Taylor in Baltimore, Maryland.  Frank March subsequently wrote to Mr. Thermos regarding the meeting and the terms of a proposed agreement pursuant to which Seaward and UPC would divide production of foam-filled fenders 70% to Seaward and 30% to UPC.  As part of the agreement, Mr. March's letter proposed a payment of $3 million dollars by Seaward to Gerald Thermos personally as compensation for "consulting services."

56.     On or about August 15, 2000, Robert Taylor wrote to Mr. Thermos regarding the ongoing discussions regarding the proposed "joint venture" between Seaward and UPC.  The letter outlined terms acceptable to Seaward, noting that Seaward's management and owners had reviewed the main points of issue remaining between the parties. Amongst the terms referenced in the letter and its attachment was the same 70/30 production split previously referenced by March.

57.     Beginning in approximately 2000 and continuing through April 2004, Seaward (later TEP) and UPC coordinated their pricing and bids on projects so as to a) distribute their

cumulative manufacturing work 70% to Seaward/TEP and 30% to UPC and b) simultaneously charge more for their products. Such a result was possible, for Seaward/TEP, UPC and/or their distributors were frequently the only foam-filled fender or buoy suppliers bidding on the subject projects.

58.    The primary contact person for the day-to-day execution of the scheme at Seaward/TEP was Robert Taylor. The primary contact person at UPC was Gerald Thermos. Taylor and Thermos exchanged correspondence regularly concerning bids, pricing and related matters between approximately 2000 and April 2004, in furtherance of the scheme.

59.    During the period relevant to this Complaint, pricing lists for the products sold by the two companies were frequently identical for comparable products.

60.    The prices charged, directly or indirectly, to federal and state government programs by UPC and Seaward pursuant to the foregoing bid-rigging/price-fixing/market allocation scheme were systematically inflated beyond the competitive prices that otherwise would have been charged.

Nextwave

61.    On or about June 12, 2001, in furtherance of the foregoing scheme, SHI and UPC entered into an "Operating Agreement," which called for the creation of Nextwave.

62.    The terms of the Operating Agreement gave representatives of SHI and UPC dominion and control over Nextwave. Each company had the ability to appoint one manager to oversee the operations of Nextwave.  The managers then had the authority to select officers to run Nextwave. The Agreement named SHI's President Robert Taylor as a manager and president of Nextwave, and it named UPC's President Gerald Thermos as manager and vice-president of the company.

63.    The Operating Agreement contained explicit provisions outlining an arrangement by which Seaward and UPC would divide the market for products sold by Nextwave for the two companies. Article 7 of the Agreement, entitled "Company Business," contained the following language:

7.1    Allocation of Product Orders   All orders for Products of the Company shall be allocated to each Member for production in the discretion of the Managers pursuant to the Sales Representation Agreement, subject to the following:

(a) Base Line Products[1] - Seventy Percent of the production of Base Line Products shall be allocated to Seaward and thirty percent (30%) of such production shall be allocated to UPC.

(b) Other Products - All production of Products other than Base Line Products shall be allocated equally to each Member, or as agreed by the Managers.
* * *

7.5    Product Pricing The Company shall sell the Products at such prices and on such terms as the Managers may determine in their sole and absolute discretion.

64.    Pursuant to the terms of the Operating Agreement and their pre-existing understanding, Seaward and UPC divided the market for the products subject to the Operating Agreement.

65.    In order to keep track of the distribution of projects between Seaward and UPC, Seaward (and later TEP) generated, inter alia, "Order Logs" that identified the production value of contracts awarded to UPC and Seaward/TEP through the course of the year.

66.    In fiscal year 2001, the Order Log generated by Seaward reflected $4,107,627.04 in total orders, with 64.68% being allocated to Seaward and 35.32% being allocated to UPC.

67.    In fiscal year 2002, the Order Log generated by Seaward had a total cumulative order value of $15,652,774.25 (including revenues from the previous year) with adjusted allocations of 68.09% going to Seaward and 31.91% going to UPC.

68.    The Order Log for fiscal year 2002 (which contained entries through 11/18/02) provided at the end of the log for "Future Orders to Balance to 70/30," and specified that $973,704.18 in orders would go to Seaward to achieve the agreed upon 70/30 ratio.

---

[1]    Base Line Products are defined in Exhibit B to the Agreement as "Foam Filled Fenders" and "Surface Buoys."

69.     The Order Log for 2002 further noted that Nextwave Sales constituted 22.98% of the total sales by the two entities as of 11/18/02, but sales by UPC and Seaward outside of Nextwave were still considered in calculating the 70/30 split in production.

70.     Before, during, and after the period of Nextwave's existence, both UPC and Seaward systematically bid directly and indirectly on all projects (including government funded projects) as if they were independent competitors, without revealing their bid-rigging/price-fixing/market allocation scheme to their customers or the government.

71.     Nextwave was paid hundreds of thousands of dollars in commissions on its sales by UPC and Seaward, a substantial portion of which were directed to defendant Thermos without the knowledge of UPC's primary shareholder Elizabeth Thermos.

TEP

72.     In or around December 2002, Trelleborg acquired most of SHI's assets and operations (including the Seaward fender and buoy manufacturing operation) and discontinued SHI's participation in Nextwave.  Trelleborg continued to participate in the ongoing bid-rigging/price-fixing/market allocation arrangement with UPC, however, through its subsidiary TEP, which took over the operations of Seaward.  (Relator is informed and believes that Trelleborg recently changed the name of TEP's operations to Virginia Harbor Services, Inc.)

73.     In fiscal year 2003, TEP generated an Order Log reflecting the same basic 70/30 distribution of work between TEP and UPC.  The log indicated a total cumulative order value of $26,202,700.32 (including revenues from previous years), with adjusted allocations of 68.27% going to Seaward/TEP and 31.73% going to UPC.

74.     The Order Log for 2003 similarly provided at the end of the log for "Future Orders to Balance to 70/30," and specified that $1,486,071.49 in orders would go to Seaward to achieve the agreed upon 70/30 ratio.  All of the projects listed in Exhibit A which reflect order dates of January 2003 or later, amongst others, were impacted by the scheme and caused the United States to pay excessive non-competitive prices for fenders and buoys.

75.     TEP produced a similar log for Pending Projects in early 2004, which contained the same basic distribution of projects between UPC and TEP.  Even though the projects had not

yet been awarded, the log described the anticipated division of those projects between the two manufacturers and the estimated price for products.

76.     In the period 2000 through 2002, defendant Thermos communicated with defendants Frank March and Robert Taylor (amongst others) at Seaward in furtherance of the bid-rigging/price-fixing/market allocation scheme involving UPC, Seaward and Nextwave. Following Trelleborg's acquisition of SHI's operations in approximately December 2002, Thermos continued to communicate thereafter with Taylor (amongst others) at TEP in furtherance of the same basic scheme.

Fentek And Tomas Crawaak

77.     During the period relevant to this complaint, Fentek has sold marine fenders and other marine products, including fixed and pneumatic fenders.

78.     Fentek has had knowledge of TEP's wrongful conduct described herein and authorized and directed such wrongful conduct through, inter alia, its President Tomas Crawaak, who also sits on TEP's board.

79.     Mr. Crawaak has actively participated in directing and authorizing the bid-rigging/price-fixing/market allocation scheme described herein involving TEP and Seaward through, inter alia, meetings, conversations and/or other communications with Mr. Thermos and Robert Taylor between approximately December 2002 and the present.   In 2004 and 2005, Mr. Farrow spoke with Mr. Crawaak regarding UPC on multiple occasions.  In those conversations, Mr. Crawaak acknowledged Trelleborg/TEP coordinating its bidding with UPC in the past (i.e., prior to the time that Mr. Thermos left UPC), and he explicitly expressed a desire for UPC and MFI to reunite, and for UPC, MFI, and Trelleborg/TEP to resume the practice of bid-rigging/price fixing/market allocation that had taken place in the past.  Mr. Crawaak indicated that his motivation for resuming the arrangement was to increase profitability for the participants in the scheme.

80.     Relator is informed and believes that Fentek has benefited from the bid-rigging/price fixing/market allocation scheme described herein, through inflated prices for

marine fenders and through its own participation in the scheme via, inter alia, its President Thomas Crawaak.

81.     Relator is informed and believes that examples of sales by Fentek to the United States that were impacted by its participation in the scheme include, but are not limited to, one sale in June 2004 for a $80,258 project in Williamsburg, Virginia for DoD (USA Engineer Dist. New England) and a $94,200 project in September 2005 for a project in Germany for the U.S. Department of Defense (NAVSUP Fisc Sigonella).

Waterman Supply Company and Seymour Waterman

82.     UPC and Seaward/TEP sold their products directly to government agencies and other customers in most instances but also sold their products through distributors as well.

83.     The primary distributor used by UPC and Seaward/TEP was WSC. Waterman Supply Company had knowledge of and participated in the bid-rigging/price-fixing/market allocation scheme of UPC and Seaward/TEP described herein.

84.     Following the ostensible termination of the Nextwave Operating Agreement by TEP, UPC and TEP arranged numerous sales with or through Waterman Supply Company.

85.     Relator is informed and believes that UPC and TEP followed this approach, at least in part, to track their respective sales of products, so as to maintain the same ratios of production that had previously been outlined more formally in the Nextwave Operating Agreement.

86.     Waterman Supply Company and its owner Seymour Waterman had knowledge of the bid-rigging/price-fixing/market allocation arrangement and participated in the execution of the scheme both before and after the termination of the Nextwave Operating Agreement. Correspondence was frequently exchanged between WSC management, on the one hand, and Taylor or Thermos, on the other, which indicated that WSC and Waterman were well aware of the fact that UPC and Seaward (later TEP) were sharing pricing information and acting collusively on pending projects.

87.     One example of a project where WSC participated with UPC and Seaward in the bid rigging/price-fixing/market allocation scheme was the Earle Naval Weapons Station Facility

in Leonardo, New Jersey.  On or about July 16, 2001, WSC's manager Max Mougan requested that Gerald Thermos give WSC a quote on 20 Marine Guard Fenders for the Earle facility. Relator is informed and believes that this information was communicated to Bob Taylor by Thermos.  On September 7, 2001, Robert Taylor sent an email to Gerald Thermos, suggesting a per unit price that they should bid on the fenders, and proposing that they give Max Mougan a 5% commission on the project.  On or about December 11, 2001, Seaward quoted Midatlantic Construction a price of $25,350 per unit for the fenders with domestically produced hardware and $23,650 with imported hardware.  A copy of the bid was later provided by Taylor to WSC. On January 14, 2002, Midatlantic Construction requested a quote from UPC on the same project. Thermos sent a quote to Midatlantic Construction, specifying a minimum price of $24,000 per fender.  Relator is informed and believes that this information was also provided to WSC. Waterman Supply Company priced the fenders at $23,600 per fender and was therefore the successful bidder.

88.     Taylor sent a letter on or about January 28, 2002 to Mougan (which was copied to Thermos) reminding Mougan,"[a]s we discussed the plan is to process this order through our JV, Next Wave Marine."   The order was subsequently run through Nextwave, and appears in the log attached as Exhibit A beside Order Date January 28, 2002 with "Waterman" specified as the customer.

89.     On January 18, 2002, Max Mougan sent a purchase order to Gerald Thermos and Bob Taylor, along with a copy of the agreement showing the price at which the fenders had been sold.  On a cover post-it, he asked that WSC's net cost (i.e., the price per unit WSC would receive) be filled in by Jerry/Bob.  The number entered onto the P.O. was "$20,805 each."  In follow-up correspondence to Gerald Thermos dated January 29, 2002, Mougan noted that WSC had collected a 5% commission on the sale and that part of the sale price would also pay for hardware supplied by WSC.  Accordingly, the scheme outlined by Taylor in his September 7, 2001 email to Thermos came off essentially as planned, with a 5% commission and other benefits going to WSC as a reward for its cooperation in the scheme.

90.     Relator is informed and believes that when WSC purchased products from Nextwave, UPC or Seaward (later TEP) during the period relevant to this Complaint, such purchases were made for distribution to WSC's customers pursuant to the same basic scheme described above. Waterman Supply Company and Seymour Waterman himself then profited from commissions on the sales, and WSC profited from the sale of hardware accompanying the products, as WSC was the principal supplier of hardware to both UPC and Seaward/TEP prior to Gerald Thermos' departure from UPC.

91.     In approximately May 2004, Mr. Farrow and his brother Kenneth Farrow visited WSC to meet with Seymour Waterman and Max Mougan.   In that meeting, Douglas Farrow asked about Nextwave. Max Mougan responded, in Kenneth Farrow and Seymour Waterman's presence, that Nextwave was just an idea of Robert Taylor and Gerald Thermos that had never come into operation. In fact, WSC was one of Nextwave's primary customers.  In 2002, almost half of Nextwave's revenues came from sales of products to WSC. Seymour Waterman signed the checks made out to Nextwave by WSC for the fenders/buoys purchased during that period.

Maritime International and John Deats

92.     An additional distributor used by UPC and Seaward/TEP during the time period of this complaint was Maritime International.

93.     Maritime International and John Deats had knowledge of and participated in the bid-rigging/price-fixing/market allocation scheme of UPC and Seaward/TEP described herein. Relator is informed and believes that Maritime International and John Deats bid on projects with the knowledge that UPC and Seaward (later TEP) were coordinating their bids on the same projects. Relator is further informed and believes that Maritime International and John Deats coordinated their bids with UPC and Seaward on the same projects.

94.     One example of Maritime International and John Deats' knowledge and participation in the bid-rigging/price-fixing/market allocation scheme is given by an email dated December 12, 2003, wherein John Deats wrote to Gerald Thermos expressing his concerns about a Seaward bid on a projected titled Dakota Bulk. In his message, he states "Seaward quoted

$14,500 through a local agent (Spectra)???  What the F?!???!!???  I thought that you all had talked about this job?"

95.    In an email dated September 30, 2003, Deats passed along information concerning another project, then added "[L]et me know if you already know about this (or if Bob told you about it)."

96.    In another email dated November 14, 2002, Mr. Deats wrote: "What about the hardware stuff from Bob??  Did ya'll standardize things so that we can begin pricing stuff for you???"

97.    Relator is informed and believes that "Bob" in both of the foregoing emails refers to Robert Taylor at Seaward.

98.    Relator is informed and believes that the projects affected by Maritime International and John Deats' misconduct include, but are not limited to, the projects listed in Exhibit A hereto where Maritime International is identified as the customer.

MFI

99.    Relator is informed and believes that, during his tenure at UPC, defendant Thermos was enriched by the bid-rigging/price-fixing scheme, through, inter alia, his withdrawal of funds from UPC via salary, the payment of his personal expenses by UPC, loans to him by UPC that were not repaid, payments to him by Nextwave, and direct cash withdrawals by him from UPC (e.g., cashiers checks).

100.    Relator is informed and believes that defendant Thermos resigned from UPC in April 2004 after a dispute between Elizabeth Thermos and defendant Thermos concerning the ownership of UPC and alleged misuse of corporate funds by him.

101.    New management has now taken over the operation of UPC as of May 2004.

102.    At or about the time of his resignation from UPC, defendant Thermos created MFI, a company which also manufactures foam fenders and buoys.  Thermos took equipment, trade secrets, and all of the staff from UPC to start and operate MFI.

103.    Relator is informed and believes that defendant Thermos and TEP have made some attempts to continue, in cooperation with WSC, Maritime International, and others, the

same bid-rigging/price-fixing/market allocation scheme with TEP and MFI, but UPC's new management has limited the success of such efforts.  After recovering from the departure of defendant Thermos and most of its employees, UPC is now actually competing on some of the projects being bid upon by MFI and TEP.  When UPC is able to participate and make a competitive bid on projects, it has caused substantial reductions in the prices (as high as fifty percent or more) being paid for the affected products.

Larry Lizotte

104.    Larry Lizotte was employed at UPC's office in Bellflower, California during the time period relevant to this complaint as a manager for the company.   Mr. Lizotte resigned at or about the time that Mr. Thermos left UPC in April 2004, then he joined Mr. Thermos at MFI.

105.    Mr. Lizotte was aware of and participated in the ongoing big-rigging/price-fixing/market allocation scheme between UPC and Seaward/TEP, from approximately 2000 through his resignation in April 2004.  Relator is informed and believes that Mr. Lizotte continued to assist in the price-fixing/bid-rigging/market allocation scheme after leaving UPC and joining MFI through at least August 2005.

106.    Mr. Lizotte assisted in the implementation of the scheme by, inter alia, preparing fraudulent bids on projects, communicating with Seaward/TEP re pending projects, and regularly tracking the projects that were to be divided between the two companies.

107.    As one example, on or about August 28, 2001, SII faxed to UPC a copy of SII's bid on a United States Navy project at Pier 12 in Norfolk, Virginia.  The price set forth in Seaward's quote was $595,400 for 26 fenders.

108.    Seaward also sent via the same fax to UPC a list of planholders on the project (i.e., the contractors who might perform the work).  Some of the names on the list were checked, some were stricken, and others had "NO" written beside them.

109.    Mr. Lizotte prepared a quote on behalf of UPC for the project.  The quote was in the amount of $625,950 for the same size fenders referenced in the Seaward quote.  The UPC quote was then sent by Lizotte to the plan-holder names checked on the list provided by

Seaward.  No substantive cost estimating information was found in the UPC file pertaining to the project.  The project was subsequently awarded to Seaward.

110.   The logs reflecting the division of projects between UPC and Seaward (later TEP) were kept on Lizotte's computer, amongst others.  The Pier 12 project is reflected in the log as awarded to Seaward with the customer name "Marine Cont. - Pier 12 Norfolk" and an Order Date of October 19, 2001.  See Exhibit A.  Defendants' scheme thus resulted in the presentation to the U.S. Navy of false and inflated claims, which were paid.

Elizabeth Thermos

111.   UPC's owner Elizabeth Thermos, a Greek immigrant, is over 70 years old, speaks English as a second language, and has not been nor is she involved in day-to-day operations at UPC.  Relator is informed and believes that Mrs. Thermos did not have knowledge of the bid-rigging scheme organized by her son Gerald Thermos.

112.   In or around April 2004, defendant Thermos transferred a substantial portion of UPC's assets to MFI, including molds, price lists, formulas, trade secrets and customer data, without paying adequate consideration to UPC for such assets.  As described above, defendant Thermos had previously transferred numerous financial assets of UPC to himself as well.

ProMar, LLC

113.   Robert Taylor created a company named ProMar, LLC in or around 1997, which was engaged in the marine fender and buoy business.

114.   Relator is informed and believes that ProMar's principal Robert Taylor operated ProMar in the same manner that he worked at Seaward.  That is, he shared pricing information and coordinated bids with competitors, including bids on pneumatic fenders, in advance of contracts being awarded by customers and without the knowledge of those customers.

115.   In 1998, ProMar was teaming with Seaward on bids.  On or about December 23, 1998, Robert Taylor wrote to Gerald Thermos on behalf of ProMar, expressing his hope there is some way in which we can work together.  He also discussed ProMar's pending bid at the time on a project in Singapore and separately faxed to Mr. Thermos a copy of a December 23, 1998 letter by ProMar to Bridgestone, which discussed ProMar's possible role in the project.

116.    On January 11, 1999, Andrew Hill wrote on behalf of ProMar to Mr. Thermos. In the letter, Mr. Hill stated that, based on his conversations with Seaward's Frank March and the owners of ProMar, "a consolidation of the industry seems to be important to all of us." He then detailed possible arrangements for merging all of the competitors into one entity.

117.    On January 15, 1999, Bob Taylor wrote to Thermos, again under ProMar letterhead, to discuss arrangements for Frank March, Taylor and Thermos to meet in Los Angeles. The letter expressed Taylor's desire "to make this work" and his belief that it "can really be good for all of us."

118.    In 1999, SHI acquired ProMar. As explained supra, UPC and SHI thereafter entered into a bid-rigging/price-fixing/market-allocation scheme.

119.    In 2002, certain of SHI's assets and operations were purchased by Trelleborg/TEP, including the Seaward fender and buoy manufacturing operation.

120.    Despite the sale of ProMar to SHI in 1999 and the sale of SHI's operations to Trelleborg in 2002, ProMar has maintained a listing in the federal government's Central Contractor Registration and also maintained an SBA Firm Profile. The address provided by ProMar in the federal government's Central Contractor Registration and in the SBA's Firm Profile is 18984 Castleguard Court, Leesburg, Virginia, which is the residential address of ProMar's "vice-president" John R. Hill. The other address listed in the Central Contractor Registration is TEP's address in Clearwater, Virginia. Robert Taylor is listed as the President of ProMar in its SBA firm profile, and he is listed as the main contact person in the Central Contractor Registration.

121.    In 2003, UPC and ProMar both submitted bids in response to a request for bids by the Navy for pneumatic and hydro-pneumatic fenders. At the time that UPC and ProMar made their offers, Taylor and UPC were engaged in the bid-rigging/price-fixing/market allocation scheme described above. Both offered the same type of fenders with their offers. Notably, however, despite the fact that Taylor was president of the Trelleborg subsidiary TEP at the time that ProMar submitted its bid on the above project, ProMar did not propose to provide

pneumatic fenders supplied by Fentek.  Instead, both ProMar and UPC proposed to provide fenders made by HS R&A, Ltd., a Korean firm.

122.    Relator is informed and believes that the reason ProMar offered pneumatic fenders made by HS R&A, Ltd. in 2003 was due to a pre-existing agreement between Trelleborg and Yokohama which provided for Trelleborg and Fentek not to compete with Yokohama in the pneumatic fender market in the United States.  See Yokohama below.

123.    During the period relevant to this complaint, relator is informed and believes that ProMar filed collusive bids on additional projects beyond the above-referenced job (including foam-filled fender projects) as part of the ongoing bid-rigging/price-fixing/market allocation scheme involving its principal Robert Taylor.

Donald Murray

124.    Donald Murray was CFO of Seaward then moved into a similar position at TEP after the acquisition of Seaward's operations by Trelleborg.

125.    Mr. Murray was involved in the price-fixing/bid-rigging/market allocation scheme from January 2002 (and likely earlier) through at least early 2004 (and likely later).

126.    Mr. Murray participated in preparing the logs described above that were used by Seaward/TEP and Seaward to coordinate their conspiracy.  On or about January 7, 2002, Murray sent a fax to Thermos' accountant, with the Nextwave Order log as of that date attached.  On the cover sheet, Murray referred to the log as the "order log I keep."

127.    The logs used by UPC and Seaward/TEP were produced on Excel spreadsheets. Murray's name appears as the author in the properties section of at least one of the logs/spreadsheets, viz, a spreadsheet named Nextwave Marine Order Log 8 Oct 02.

128.    Mr. Murray participated in the preparation of the logs with knowledge that they were to be used in implementing the price-fixing/bid-rigging/market allocation scheme described herein.

129.    Mr. Murray prepared the financials for Nextwave and participated in direct communications with Gerald Thermos and his accountant Neil Xavier regarding Nextwave's financials.  As one example, on or about January 22, 2002, Murray sent a fax to Bob Taylor,

with the Nextwave order log for 2001 attached.  In his message to Taylor, Murray wrote that he had determined the amount of "commissions" to be paid to Nextwave by UPC and Seaward, based on the total sales by the two entities.  He wrote this message, while aware of the fact that no orders had even been placed with Nextwave as of that date, i.e., that it was simply a vehicle for allocating sales between the two entities.  Murray's knowledge on this point is reflected in another fax message he sent on January 7, 2002 to Thermos' accountant Neil Xavier, where Murray wrote the following: "In January there will be actual orders processed through NextWave.  Through December, everything was on a commission basis."

130.    Murray thus participated and advanced the conspiracy by which projects were distributed between UPC and Seaward, and certain of the profits were directed to Nextwave then on to the principals in the conspiracy.  The foregoing financial data provided by Murray included Journal detail reports, which reflected large payments by Nextwave directly to Gerald Thermos.

131.    As late as February 21, 2003, Murray was also providing similar financial information regarding Nextwave's operations directly to Gerald Thermos.

132.    Murray thus also contributed to the submission of false claims for payment by the United States of excessive prices for the products sold by UPC and Seaward/TEP, including the items identified in Exhibit A hereto.

Peter Nilsson

133.    Peter Nilsson is the current president of Trelleborg.  Mr. Nilsson was President of TES between approximately June 1, 2003 and October 1, 2005.  Prior to June 1, 2003, Mr. Nilsson was head of the Trelleborg Engineered Products business unit within TES.  During the period relevant to this complaint, Nilsson also sat on TEP's board.

134.    During the period relevant to this complaint, Peter Nilsson authorized, directed and approved the foregoing bid-rigging/price-fixing/market allocation scheme involving fenders and buoys.  Nilsson directed, encouraged and approved such conduct via multiple communications between 2002 and 2004 with other Trelleborg personnel, including, but not limited to Tomas Crawaak, who sought and received Nilsson's approval for Trelleborg to participate in the scheme.

135.   Relator is informed and believes that once Nilsson became head of TES in 2003, he directed and approved the same pattern of bid-rigging/price-fixing/market allocation by Trelleborg with regard to other marine products, including, but not limited to, marine hoses sold by Trelleborg Industrie (described in more detail below).   Relator is informed and believes that Nilsson engaged in communications regarding the bid-rigging/price-fixing/market allocation scheme, directly or indirectly, with the individuals identified below who ultimately reported to him at Trelleborg.   Relator is informed and believes Nilsson's direction, authorization and approval of this conduct continued through the entire period relevant to this complaint, including the period after he became president of Trelleborg.

Damages

136.   The claims for payment for foam fenders and buoys and related products that defendants Gerald Thermos, Frank March, Seaward, Trelleborg, TEP, TES, Waterman Supply, Maritime International, MFI, Larry Lizotte, Bob Taylor, Don Murray, Seymour Waterman, John Deats and others caused to be submitted, directly or indirectly, to federal and state agencies and/or programs, between approximately June 2000 (and possibly earlier for certain of the defendants) and at least August 2005 were inflated pursuant to the above-described bid-rigging/price-fixing/market allocation scheme, and were paid.   Moreover, after the Government's investigation was disclosed in August 2005, the market remained inflated as a result of the scheme and the Government's damages continued thereafter.

137.   Attached as Exhibit A to this Complaint is a summary of most of the information in the Order Logs referenced above, with an additional column indicating relator's understanding as of the date the original complaint was filed as to the source of funding for particular projects. As noted in Exhibit A, the vast majority of the projects were federally financed.   There are also numerous sales by the defendants to federal Government entities, which are not identified on Exhibit A as government sales.   A number of projects were also financed by state entities, including, but not limited to, the following projects:  Key West, TEP, Job No. 31399, approximately March or April 2003 (Florida); City of Monterey, Seaward, Job No. 31183, approximately July 11, 2001 (California); Miami/Dade, TEP, Job No. 3163 (number listed on

log), approximately January 2, 2003 (Florida); Tampa Port, TEP Job. No. 31429, approximately August 10, 2003 (Florida); Port of Los Angeles, MFI, late 2004-early 2005 (California).

138. Government agencies and/or programs affected by defendants' scheme include, but are not limited to, the U.S. Department of Defense, the U.S. Navy, the U.S. Army Corps of Engineers, the U.S. Coast Guard, and state/local entities within Florida and California, which paid inflated prices for the products specified. The above-referenced defendants caused the submission of false claims to the foregoing state and federal entities. See Exhibit A.

139. Certain of the projects listed on Exhibit A with references to "private," "distributor," "contractor," "unknown," and/or "other" still involve government agencies and/or programs as end users who ultimately paid the inflated prices and thus were impacted by the scheme. Projects with references to states on the exhibit may have involved federal funds as well. The list is also not complete.

140. Relator is informed and believes that there has been a drop in prices for certain products, since defendant Thermos' departure from UPC, in those instances where UPC was able to make a competitive bid on a particular project. As UPC was essentially relearning its business with new personnel, following Mr. Thermos's departure in April 2004, it was not as efficient or competitive in price as it might have been for some time thereafter. Nonetheless, when UPC was able to make competitive bids on certain projects, the prices charged to customers for affected products fell to as low as approximately half the amounts that were previously being charged for the same products under the prior collusive pricing regime.

141. The exact amount of damages to government programs resulting from defendants' conduct has yet to be finally determined. But relator preliminarily estimates the damages to federal government programs resulting from defendants' scheme involving foam-filled fender and buoys as being at least approximately $9,000,000 or more.

Criminal Proceedings to Date

142. On or about June 9, 2006, Gerald Thermos entered into a plea agreement with the United States pursuant to which Mr. Thermos agreed to plead guilty to "a single count criminal information charging the defendant with participating in a conspiracy to suppress and

eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere between from in or about June 2000, continuing until in or about August 2005, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." The agreement provided, upon the satisfaction of certain conditions, for the Government to recommend that Mr. Thermos pay a $50,000 criminal fine and serve a sentence of eight months, including four months in jail and four months of supervised release. The plea agreement was filed on September 15, 2006. Mr. Thermos was subsequently sentenced to jail time which he has now served.

143.    On or about February 14, 2007, Robert Taylor entered into a plea agreement with the United States pursuant to which Mr. Taylor agreed to "waive indictment and plead guilty to a three count criminal information charging the defendant with: (1) participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere from at least as early as June 2000, continuing until as late as August 2005, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; (2) participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of plastic marine pilings in the United States and elsewhere from at least as early as December 2000 until as late as May 2003, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (3) participating in a conspiracy to corruptly give, offer or agree to give money with the intent to influence an agent of the New York City government in connection with a series of transactions from at least as early as January 2000 until at least December 2002, in violation of 18 U.S.C. §§371 and 666." The plea provided, upon the satisfaction of certain conditions, for the Government to recommend that "the Court impose a sentence requiring the defendant to pay to the United States a criminal fine of $100,000 and to serve a jail term of thirty (30) months of incarceration." The plea was filed on May 10, 2007 in the United States District Court for the Eastern District of Virginia. Mr. Taylor was subsequently sentenced to serve jail time for his offense.

144.    On or about June 6, 2007, Donald Murray entered into a plea agreement with the United States Department of Justice, pursuant to which he plead guilty to, inter alia, the

following allegations in the criminal information filed against him on the same date: "Beginning at least as early as December 2002 and continuing until as late as January 2004, the exact dates being unknown to the United States, the defendant participated in an ongoing combination and conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere."

145.    The criminal information filed against Murray further alleged that he engaged in the following specific conduct to advance the conspiracy: "(a) attended meetings and engaged in discussions by telephone, facsimile and electronic mail, regarding the sale of foam-filled marine fenders and buoys sold in the United States and elsewhere; (b) agreed during those meetings and discussions to allocate jobs and to create and exchange order logs in order to implement and monitor this agreement; (c) agreed during those meetings and discussions not to compete for one another's customers either by not submitting prices or bids to certain customers, or by submitting intentionally high prices or bids to certain customers; (d) submitted bids in accordance with the agreements reached; (e) sold foam-filled marine fenders and buoys to the U.S. Coast Guard, the U.S. Navy, and others pursuant to those agreements at collusive and noncompetitive prices; (f) accepted payment for foam-filled marine fender and buoys sold at the collusive and noncompetitive prices; (g) created and exchanged order logs, in accordance with the agreements reached, reflecting the sales made by both companies in order to track the success of the market allocation and bid-rigging scheme; and (h) authorized or consented to the participation of subordinate employees and/or distributors in the conspiracy." Mr. Murray was subsequently sentenced to serve jail time for his offense.

146.    The logs referenced in the criminal information against Murray were provided to the United States by relator prior to the filing of his original complaint in this matter.

Thermos, MFI and Maritime International After Thermos Criminal Plea

147.    As described in more detail above, Mr. Thermos pleaded guilty on June 14, 2006 to participating in the bid-rigging/market allocation/price-fixing scheme described herein with respect to foam-filled fenders and buoys, while he was with UPC and MFI. The information was

publicized by way of a U.S. Department of Justice press release and contemporaneous news stories concerning the plea.

148.    On or about July 15, 2006, the U.S. Navy issued Request for Quotations ("RFQ") No. SPM7M2-06-T-7075.    On or about July 27, 20006, Maritime International submitted a bid on the project, with the intent of supplying MFI produced fenders.

149.    On August 4, 2006, the Navy awarded contract SPM7M1-06-0722 to Maritime International following its bid on RFQ No. SPM7M2-06-T-7075.

150.    On or about August 24, 2006, MFI was formally debarred from contracting with the U.S. Navy.  Nonetheless, Maritime International and MFI thereafter caused the delivery of MFI produced foam fenders to government owned facilities under Contract No. SPM7M1-06-0722.

151.    The Navy has regulatory restrictions on the issuance of contracts to parties who have been convicted of felonies.  Relator is informed and believes that MFI would have been prohibited by the Navy from bidding on RFQ No. SPM7M2-06-T-7075, due to the fact that MFI's principal Gerald Thermos had pleaded guilty to the criminal conduct described above prior to the issuance of the request for quotes.  Relator is informed and believes that Gerald Thermos and John Deats therefore conspired to have Maritime International bid on RFQ No. SPM7M2-06-T-7075 and supply MFI's fenders to the Government, so as to evade the restrictions that would otherwise have prohibited MFI from making the sale to the United States.

152.    As a result of such false representations and omissions, the referenced contract was awarded to Maritime International and monies were paid to Maritime International by the United States in excess of $39,000 on the contract.  Relator is informed and believes that the majority of said funds were then paid to MFI and thus benefited Gerald Thermos.

153.    The United States was damaged by the full amount of the contract price paid to Maritime International for the above-reference fenders.

## V. MISREPRESENTATIONS RE: BUSINESS SIZE AND NONMANUFACTURER STATUS

Seaward and TEP

154.   Beginning in approximately 2003 and continuing through the present, TEP and Seaward have caused bids to be submitted on government projects reserved as small business set asides, despite the fact that their common business enterprise was not and is not a small business concern.   As described further below, Seaward is currently affiliated with, dominated, and controlled by TEP, and TEP is owned by Trelleborg, a large business concern which, during the relevant period, employed approximately 22,000 people and had worldwide annual sales of approximately SEK 23 billion.   In light of this affiliation between Seaward and TEP, Seaward does not qualify as a small business concern.   See 13 CFR § 121.201.

155.   On or about March 28, 2005, the Fleet and Industrial Supply Center ("FISC") issued a solicitation for marine fenders as a small business set-aside.   In or around April 2005, TEP and Seaward caused a bid to be submitted to FISC under the name of Seaward.   On or about May 6, 2005, FISC awarded Contract No. N00604-05-P-0638, valued at $454,240.00, to Seaward.

156.   On or about May 9, 2005, relator Farrow instructed a member of UPC's staff to telephone the FISC contracting office to register a protest to the award of Contract No. N00604-05-P-0638 to Seaward, advising them that Seaward, as an affiliate of TEP, was not a small business concern.   That protest was forwarded by FISC to the SBA under cover of a May 13, 2005 letter.

157.   On or about May 18, 2005, relator Farrow drafted a letter to the SBA, which described the relationship between Seaward and TEP and gave information about the size of Trelleborg.   At Mr. Farrow's direction, the letter was signed and submitted to the SBA by an employee of UPC.

158.   Seaward responded to subsequent inquiries by the SBA in May 2005.

159.   On or about June 2, 2005, the SBA issued a Size Determination in connection with the protest engendered by Mr. Farrow, which concluded that "Seaward is other than a small

business concern because of its affiliation with TEP, which is owned by a known large business concern . . . ." The SBA also concluded that Seaward was "not in compliance with the terms of the non-manufacturer rule."

160.    Other contracts have been awarded to Seaward and TEP without an intervening protest. As one example, FISC awarded Contract No. N00604-05-P-0368 to Seaward on February 15, 2005.  Seaward and TEP caused the same misrepresentations regarding business size to be made in connection with the Seaward bid on this contract as described above.    Relator Farrow challenged FISC's award of Contract No. N00604-05-P-0368 to Seaward, asserting the same basic arguments regarding Seaward/TEP's inability to qualify for small business status.

161.    On or about January 24, 2003, the Defense Supply Center Columbus ("DSCC") awarded Contract No. SP0760-03-M-881 to Seaward.  The contract, which amounted to $6,100, was designated as a small business set aside.  Seaward and TEP caused the same misrepresentations regarding business size to be made in connection with the Seaward bid on this contract as described above.

162.    Relator is informed and believes that Trelleborg, TEP, and Seaward have engaged in a pattern and practice of misrepresenting the size of the companies' businesses since at least January 2003 through the present, in order to qualify for small business set-asides to which they were not entitled.

163.    Relator is further informed and believes that it has been the pattern and practice of Trelleborg, TEP, and Seaward to falsely represent Seaward as a manufacturer of marine related products when in fact Trelleborg has been the manufacturer of such products.

164.    The exact amount of damages to the Government resulting from Seaward/TEP's misrepresentations regarding business size has yet to be determined and will be established at trial.

## VI.  **SEA PILINGS**

165.    In addition to its sales of marine fenders, TEP (and before it Seaward) also manufactures plastic sea pilings.  Relator is informed and believes that TEP and Seaward have

33

conducted such business at times relevant to this case under, inter alia, the names SeaPile and SI Plastic Products.

166.   Relator is informed and believes that there are a limited number of manufacturers that produce plastic sea pilings and that the other primary manufacturer of plastic sea pilings in the United States is PPI.

167.   Relator is informed and believes that Seaward (later TEP) engaged in the same basic pattern and practice of rigging bids and allocating the market with PPI as it did with UPC described above.

168.   Defendant Thermos has had a relationship with the owners and/or management of PPI from at least the late 1990s forward.   UPC sold chemicals to PPI.   Moreover, even though UPC was not in the plastic piling business, defendant Thermos included advertising for PPI's plastic pilings on UPC's website until his departure from UPC, and Andrew Barmakian frequently met with Mr. Thermos at UPC to discuss the operations of their respective businesses.

169.   The foregoing meetings between PPI management and defendant Thermos occurred during the same period that UPC had its agreement with Seaward (later TEP) to divide the market for, inter alia, certain marine fenders and buoys.   In this same period, defendant Thermos and UPC also had possession of Seaward's internal pricing information on plastic pilings.

170.   In approximately 2000, Defendants Thermos, Seaward, and PPI developed a plan for the coordinated sales of PPI and Seaward pilings through a "joint venture" managed by Robert Taylor, Andrew Barmakian, and Gerald Thermos.   Meeting(s) were held amongst UPC, PPI, and Seaward in California in approximately October 2000 regarding the plan, and documents were drafted outlining how the operation would work.   As with Nextwave, the plan provided that sales by the joint venture entity would be distributed according to "target production ratios" for Seaward/TEP and PPI.   Moreover, if Seaward/TEP or PPI sold directly to customers, the plan provided for the same target production ratios to be observed.   Relator is informed and believes that Frank March, the principal of Seaward, was aware of and approved the plan.

171.   Relator is informed and believes that, pursuant to the foregoing plan, since approximately 2000 through at least 2006 and likely later, PPI and Seaward/TEP have engaged in a practice of price-fixing/bid-rigging/market allocation on projects involving plastic pilings and/or related marine products, and have systematically charged excessive non-competitive prices, directly and indirectly, to federal and state government customers (including Florida and California).   Examples of government projects impacted by this scheme include, but are not limited to, the Bridge of Lions project in Florida in approximately 2004 and the Beckett Street project in approximately 2004.

172.   Bidding by TEP and PPI have reflected the same general pricing for products. Based on relator's direct and indirect knowledge regarding the costs of producing pilings, the high profit margins being earned by TEP on the prices being bid are reflective of non-competitive bidding

173.   As a result of this scheme, relator is informed and believes that, while the affected government agencies were damaged by paying inflated prices, PPI and Seaward/TEP's profited from the scheme.   The total damages from this scheme to the United States, Florida, and California are as yet undetermined.

Criminal Proceedings to Date

174.   On or about September 24, 2007, TEP's CFO William Alan Potts entered into a plea agreement with the United States pursuant to which Mr. Potts agreed to plead guilty to a single count criminal information charging the defendant with participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of plastic marine pilings from as early as December 2000 and continuing until as late as May 2003 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.   Mr. Potts was sentenced in June 2008 to pay $60,000 and serve a sentence of six months in jail.

175.   On or about November 17, 2008, Andrew Barmakian entered into a plea agreement with the United States pursuant to which Mr. Barmakian agreed to plead guilty to a single count criminal information charging the defendant with participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of

plastic marine pilings from as early as December 2000 and continuing until as late as May 2003 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.   Under the plea agreement, which is subject to court approval, Barmakian has agreed to serve a sentence and pay a criminal fine to be determined by the court.   Barmakian has not been sentenced as of the date of this filing.

176.     The foregoing criminal proceedings arose from the allegations originally made by relator in this case.

## VII. <u>OTHER FENDERS</u>

177.     Other fenders marketed in the marine products industry include, but are not limited to, fixed fenders and pneumatic fenders.  Fixed fenders are typically attached to docks. Pneumatic fenders float like foam-filled fenders but are typically filled with air or in some cases with air and water (hydro-pneumatic fenders).

178.     Relator is informed and believes that certain of the defendants, including, but not limited to, Fentek, TEP, Trelleborg, ProMar, Robert Taylor, Yokohama and FenderCare, Bridgestone, Maritime International, Waterman, and Sumitomo also engaged in bid-rigging/price-fixing/market allocation in connection with the sale of fixed and/or pneumatic fenders to state and federal government customers between at least approximately 2000 through 2005.

<u>Yokohama</u>

179.     Relator is informed and believes that Yokohama has been engaged in a bid-rigging/price-fixing/market allocation scheme in the area of marine fenders, including pneumatic fenders, since approximately 2000 (and likely earlier) through the present.  Yokohama's pneumatic fender sales are handled by the "Industrial Products" section of its "Multiple Business" unit.  Notably, the same unit also handles marine hose sales.  (see below)

180.     Since approximately 2002, Fentek and Trelleborg have been notably absent from the pneumatic fender market in the United States, despite the fact that Fentek sells pneumatic fenders, and Trelleborg and Fentek have had offices in the United States that offer marine fenders.  In relator's experience, Fentek has not bid on pneumatic fender projects in the United

States that it would be qualified to bid upon.  Fentek has sold fixed fenders, however, during the relevant period.

181.   To relator's knowledge, most, if not all, pneumatic fenders sold to the United States and state government entities between at least 2002 and the present have been manufactured by Yokohama, which has had a worldwide share of the pneumatic fender market ranging from approximately 60-80% in recent years.

182.   By contrast, in Europe, Trelleborg/Fentek has been a market leader in marine fenders in recent years, and Yokohama has not competed with them in other areas of marine fender production.  Relator is informed and believes that the reason for the lack of competition in the foregoing markets is an agreement between, inter alia, Yokohama and Trelleborg/Fentek to divide the worldwide market for their products, so that both companies can reduce competition and charge higher prices for their products.

183.   Relator Farrow has conducted research on the prices paid by United States government customers for fenders produced by Yokohama (and sold by its representative Fender Care Naval Solutions Ltd.) between 2002 and the 2005.  Relator's personal knowledge and research of non-public sources indicate that the prices paid by United States Government customers for pneumatic fenders made by Yokohama have been substantially in excess of market prices for those fenders.

184.   As an example, on or about September 30, 2005, after issuing a solicitation for bids, the United States agreed to pay $478,560 for four hydro-pneumatic fenders made by Yokohama, pursuant to Contract No. N6554005Q5024, issued by the Naval Surface Warfare Center in Philadelphia, Pennsylvania.

185.   On or about July 22, 2005, after issuing a solicitation for bids, the United States agreed to pay $78,890 for two pneumatic fenders made by Yokohama, pursuant to Contract No. N6554005M0353, issued by the Naval Surface Warfare Center in Philadelphia, Pennsylvania.

186.   On or about June 7, 2002, after issuing a solicitation for bids, the United States agreed to pay $101,662.00 for one pneumatic fender made by Yokohama, pursuant to Contract

No. N65540-02-M-0333, issued by the Naval Surface Warfare Center in Philadelphia, Pennsylvania.

187.   Relator's research indicates that the prices charged the United States for these fenders are all at least approximately 30% in excess of market prices.  Relator is informed and believes that prices charged by Yokohama to California and Florida were similarly inflated.

188.   In or around October 2004, relator Farrow spoke with Kota Kusaba, a representative of Yokohama.  In that conversation, Kusaba acknowledged that Yokohama had a working relationship with Robert Taylor and was familiar with Promar.  Relator is informed and believes that the working relationship between Yokohama and Taylor described by Mr. Kusaba explains the absence of Trelleborg and Fentek from the United States market and the inflated non-market prices being charged by Yokohama for its pneumatic fenders.

189.   The extent of damage to the United States, Florida, and California resulting from Yokohama's bid-rigging/price-fixing/market allocation scheme is presently unknown to relator and will be determined at trial.  Relator is informed and believes that the foregoing bid-rigging/price-fixing/market allocation scheme has been in effect since before 2002, as far back as 1996.

FenderCare

190.   FenderCare Naval Solutions has been the party that actually contracted with the United States to supply all of the Yokohama fenders identified above.

191.   On or about July 28, 2004, the United States agreed to pay $334,920 for hydro-pneumatic fenders supplied by FenderCare Naval Solutions, pursuant to Contract No. N6554004M0350, issued by the Naval Surface Warfare Center in Philadelphia, Pennsylvania. Relator is informed and believes that the fenders provided by FenderCare pursuant to this contract were also manufactured by Yokohama.

192.   On or about May 27, 2003, the United States agreed to pay $1,844,160 for pneumatic and hydro-pneumatic fenders supplied by FenderCare Naval Solutions, pursuant to Contract No.N6554003M0299, issued by the Naval Surface Warfare Center in Philadelphia,

Pennsylvania. Relator is informed and believes that the fenders provided by FenderCare pursuant to this contract were manufactured by Yokohama.

193.   Relator is informed and believes that most, if not all, of the Yokohama fenders sold to the United States during the period relevant to this complaint, including those specifically mentioned herein, were supplied by FenderCare Naval Solutions. Relator is informed and believes that FenderCare Naval Solutions and/or its parent Fender Care Marine Solutions have had exclusive rights to represent Yokohama in the United States during the period relevant to this complaint. During the time period relevant to this complaint, relator is informed and believes that FenderCare has handled about 60% of Yokohama's manufacturing output. Relator is informed and believes that Yokohama executed its bid-rigging/price-fixing/market allocation scheme with the full knowledge and complicity of FenderCare.

194.   FenderCare also sells foam fenders on behalf of Maritime International, whose involvement in bid-rigging/price-fixing/market allocation is described above. Relator is thus informed and believes that FenderCare is familiar with and has cooperated with the bid-rigging/price-fixing/market allocation scheme affecting both pneumatic and foam-filled fenders as well.

195.   Relator is informed and believes that the prices charged to the United States, Florida and California for the pneumatic fenders supplied by FenderCare Naval Solutions were all at least approximately 30% in excess of market prices for such fenders, as a consequence of the wrongful conduct described herein.

196.   The extent of damage to the United States, Florida and California resulting from FenderCare Naval Solutions's bid-rigging/price-fixing/market allocation scheme is presently unknown to relator and will be determined at trial.

Bridgestone

197.   During the period relevant to this complaint, Bridgestone manufactured pneumatic fenders. Relator is informed and believes that Bridgestone participated in the price-fixing/bid-rigging/market allocation scheme described above with regard to marine fenders, including pneumatic fenders. Robert Taylor was in communication with representatives of

Bridgestone regarding fender projects starting as early as approximately 1998 and, on information and belief, continued such communications thereafter as well.

198.   Relator is informed and believes that the prices charged to plaintiffs for marine fenders made by Bridgestone were inflated in the same manner as described above with regard to sales of Yokohama fenders.

199.   Relator is informed and believes that Sumitomo's participation in the foregoing scheme caused the United States, Florida and California to pay inflated prices for marine fenders.

200.   The extent of damage to the United States, Florida and California resulting from Bridgestone's participation in the bid-rigging/price-fixing/market allocation scheme is presently unknown to relator and will be determined at trial.

Sumitomo

201.   During the period relevant to this complaint, Sumitomo manufactured marine fenders, including fixed and pneumatic fenders. Relator is informed and believes that Sumitomo participated in the price-fixing/bid-rigging/market allocation scheme described above with regard to marine products, including, but not limited to, marine fenders. Relevant marine fenders marketed by Sumitomo include, but are not limited to, pneumatic, F-type, FB-Type, hollow cylindrical, D-type, circular type, Pi-type, Ultra Pi-type, V-type, Lambda-type, beta-type, fishery-type, special-type, scaffold-type., and corner protectors.

202.   Relator is informed and believes that the prices charged to plaintiffs for marine fenders made by Sumitomo were inflated in the same manner as described above with regard to sales of Yokohama fenders.

203.   Relator is informed and believes that Sumitomo's participation in the foregoing scheme caused the United States, Florida and California to pay inflated prices for marine fenders.

204.   The extent of damage to the United States, Florida and California resulting from Bridgestone's participation in the bid-rigging/price-fixing/market allocation scheme is presently unknown to relator and will be determined at trial.

# VIII. HOSES

205.   Certain of the defendants, including, but not limited to, Trelleborg, TES, Trelleborg Industrie, Yokohama, Dunlop, Manuli, Parker, and Bridgestone engaged in a bid-rigging/price-fixing/market allocation scheme in connection with the sale of marine hoses and related equipment, which were paid for by the United States between at least 1999 and May 2007 ("the hose scheme").   The hose scheme was part of the broader bid-rigging/market allocation scheme engaged in by certain of the defendants, including Trelleborg.

Background to the Scheme

206.   Marine hoses are large flexible hoses (between 6" and 24" in diameter) used to transfer liquid matter.  The hoses are commonly used for, amongst other purposes, to transfer oil or petroleum between two ships or between ships and oil facilities or buoys.   The Department of Defense purchased marine hoses for use at military bases, amongst other purposes, between 1999 and 2007.  Once the conspiracy began, all purchases thereafter by DoD between 1999 and 2007 were impacted by the scheme; that is, the government paid inflated prices for the products. Examples of the types of hoses affected by the scheme include, but are not limited to, the following:   Trelleborg's Trelline and Kleline hoses and previous versions; Yokohama's Seaflex Marine, Seaflex Super Stream, and Seaflex STS (ship-to-ship) hoses and previous versions; Manuli's Single Carcass, Double Carcass, Freeflex, Longlength, and Dock Hoses (including, but not limited to, the free floating and submarine varieties, of the hose series H3006, H3007, H3030, H3232, H3030, H3838, H3737, H5006, H5007, H5050, H5252, H5858, H5757 and previous versions); Dunlop's SAFLOTE Double Carcass Anti-pollution Floating Hose, SAFGARD Double Carcass Anti-Pollution Submarine Hose, SELFLOTE Single Carcass Floating Hose, and Single Carcass Submarine Hose;  Parker's floating, submarine, single and double carcass hoses (including, but not limited to, the GPL DC TIPO 6 and ISOLA MAX hoses and previous versions); Sumitomo's rubber hoses and dredging hoses.  The hose scheme was part of the same basic pattern of conduct previously described with regard to fenders and buoys that was engaged in by some of the defendants, including, but not limited to, Trelleborg.  All of

the defendants involved in the hose scheme coordinated their pricing and bids on projects in advance of bidding so as to fix prices, allocate market share and rig bids.

Participants in the Hose Scheme

207.    Trelleborg participated in the hose scheme from at least 1999 through April 2007. Jacques Cognard, Trelleborg Industrie's Oil and Marine Manager, represented Trelleborg in the conspiracy from 1999 through at least April 2007. Christian Caleca, President of the Industrial Hose Business Unit of Trelleborg Industrie in France, also represented Trelleborg in the conspiracy from at least June 2001 through April 2007. Like TEP and Fentek, Trelleborg Industrie was part of the TES business area of Trelleborg, which was headed by Peter Nilsson between approximately June 1, 2003 through October 1, 2005. As of October 1, 2005, Mr. Nilsson was appointed President of Trelleborg AB, largely as a result, according to Trelleborg, of Mr. Nilsson's prior success in "constantly improving [TES's] profitability."

208.    Yokohama participated in the hose scheme since at least 1999 through April 2007.  Yokohama has had one or more participants in the scheme during that time.

209.    Bridgestone participated in the hose scheme from at least 1999 through April 2007. Misao Hioki represented Bridgestone in the conspiracy from at least October 2006 through April 2007.

210.    Parker participated in the hose scheme from at least 1999 through April 2007. Vanni (Giovanni) Scodeggio represented Parker in the conspiracy from at least January 2007 through April 2007.

211.    Manuli participated in the hose scheme from at least 1999 through April 2007. Francesco Scaglia represented Manuli in the hose scheme in at least 2007.

212.    Dunlop participated in the hose scheme between at least 1999 and April 2007. Bryan Allison and David Brammar represented Dunlop in the scheme. Allison represented Dunlop in the hose scheme from at least 2000 through April 2007, and Brammar represented Dunlop in the scheme from at least 2002 through 2007.

213.    Phoenix AG participated in the hose scheme between at least December 2000 and July 31, 2002.

214.   Relator is informed and believes that Sumitomo participated in the scheme between 1999 through April 2007.

Criminal Proceedings to Date

215.   Per the U.S. Department of Justice and court records, the following criminal proceedings have taken place to date in connection with the hose scheme:

216.   On December 12, 2007 Bryan Allison and David Brammar, executives with Dunlop Oil & Marine Ltd., a manufacturer of marine hose located in Grimsby, United Kingdom, pled guilty to their participation in the marine hose conspiracy. Under the terms of their plea agreements, Allison agreed to serve 24 months in jail and Brammar agreed to serve 20 months in jail. Peter Whittle, a former Dunlop employee now working as an independent consultant, pleaded guilty for his role in the conspiracy and agreed to serve 30 months in prison. Under the terms of the plea agreements, Allison, Brammar and Whittle were returned in custody to the United Kingdom, where they were arrested on December 18, 2007, and criminally charged and later sentenced for cartel offenses by U.K. authorities.

217.   On December 1, 2008, Dunlop pleaded guilty to participating in the hose scheme from as early as 1999 until as late as May 2007.  Dunlop agreed to pay a criminal fine of $4.54 million

218.   Uwe Bangert, a German national and former executive with Dunlop's former parent company, Phoenix AG, was indicted on July 19, 2007, for his participation in the marine hose cartel.  A trial date has not been set.

219.   Manuli Rubber Industries SpA (Manuli), Robert L. Furness, the former president of Manuli's former Plantation, Fla.-based subsidiary, and Charles J. Gillespie, a former Manuli regional sales manager have pleaded guilty for their roles in this conspiracy. Under the terms of the plea agreements, which are subject to court approval, Manuli has agreed to pay a criminal fine of $2 million, Furness has agreed to serve 14 months in prison and pay a $75,000 criminal fine, and Gillespie has agreed to serve 12 months and one day in jail and pay a $20,000 criminal fine. Manuli, Furness and Gillespie also have agreed to cooperate fully in the Department's ongoing antitrust investigation. Francesco Scaglia, the deputy manager of Manuli's Oil & Marine

Division, and Val M. Northcutt, another regional sales manager, were acquitted on Nov. 11, 2008, in the Southern District of Florida after being charged with participating in the conspiracy.

220.    Executives with Trelleborg Industrie S.A.S., Christian Caleca and Jacques Cognard, pleaded guilty to charges stemming from their roles in the conspiracy.  In December 2007, each was sentenced to serve 14 months in prison.  Caleca was sentenced to pay a $75,000 criminal fine and Cognard was sentenced to pay a $100,000 criminal fine.  Caleca and Cognard also have agreed to cooperate fully in the Department's ongoing antitrust investigation.

221.    Giovanni Scodeggio, an Italian citizen who is the manager of Parker ITR S.r.l.'s Oil & Gas Business Unit, pleaded guilty to a one-count felony charge in U.S. District Court in Houston in August 2008. Scodeggio was sentenced to pay a criminal fine of $20,000, to serve six months of house arrest and to cooperate with the Department's ongoing antitrust investigation.

222.    In May 2007, Misao Hioki, an executive involved in the sale of marine hose for Bridgestone Corporation in Japan, was charged for his involvement in the conspiracy. The charges involving Hioki are pending in U.S. District Court in the Southern District of Florida.

Details of the Scheme

223.    Per Government filings regarding its investigation to date, the members of the hose scheme engaged in the following conduct during the course of the conspiracy period (i.e., 1999 through 2007):

- Attended meetings or otherwise engaged in discussions in the United States and elsewhere by telephone, facsimile and electronic mail regarding the sale of marine hose;
- Agreed during those meetings and discussions to allocate shares of the marine hose market among the conspirators;
- Agreed during those meetings and discussions to a price list for marine hose in order to implement and monitor the conspiracy;
- Agreed during those meetings and discussions not to compete for one another's customers either by not submitting prices or bids to certain customers or by submitting intentionally high prices or bids to certain customers;
- Submitted bids in accordance with the agreements reached;
- Provided information received from customers in the United States and elsewhere about upcoming marine hose jobs to a co-conspirator who was not an employee of any of the marine hose manufacturers, but who served as the coordinator of the conspiracy, acted as

44

a clearinghouse for information to be shared among the conspirators, and was paid by the manufacturers for coordinating the conspiracy;

- Received marine hose prices for customers in the United States and elsewhere from the co-conspirator coordinator of the conspiracy;
- Sold marine hose to customers in the United States and elsewhere at collusive and noncompetitive prices pursuant to the agreements reached;
- Accepted payment for marine hose sold in the United States and elsewhere at collusive and noncompetitive prices;
- Authorized or consented to the participation of subordinate employees in the conspiracy; and
- Concealed the conspiracy and conspiratorial contacts through various means, including code names and private email accounts and telephone numbers.

Meetings

224.   Per Government filings regarding its investigation to date, the following specific meetings took place among participants in the hose scheme.

225.   Mr. Cognard, Mr. Caleca and a representative of Yokohama attended a meeting in London, England in December 1999 with Peter Whittle of PW Consulting, who assisted in coordinating the scheme.   At that meeting, Yokohama's and Trelleborg's representatives agreed upon rules for perpetrating the scheme described herein.

226.   In December 2000, the members of the scheme met again, including Whittle, Brammar, Cognard, and representatives of Manuli, Yokohama, in Bangkok, Thailand.   At that meeting, the parties held further discussions regarding the ongoing operation of the scheme.   The meeting included discussions and agreements regarding each manufacturer's market share and prices for marine hoses and related equipment, including items to be sold in the United States.

227.   In June 2001, another meeting was held, this time in Key Largo, Florida, which was attended by the members of the scheme, including Whittle, Cognard, Brammer, Caleca, along with a representative of Manuli.   During the meeting, the members of the conspiracy discussed and agreed upon their market shares and prices for marine hoses and related equipment, including items to be sold in the United States.   Mr. Caleca spoke at the meeting on behalf of Trelleborg, thanking the other conspirators for attending and specifically noting that the scheme had resulted in increased prices for marine hoses since its inception in 1999.

228.   In July 2002, the members of the scheme met again, including Whittle, Brammar, Allison, Cognard and representatives of Yokohama and Manuli attended a meeting with other conspirators in London, England.   At that meeting, the participants once again discussed and agreed upon market shares for the companies involved in the conspiracy.

229.   Following July 2002, the defendants involved in the hose scheme took additional measures to advance their scheme.   Between 1999 and 2006, coordinator Peter Whittle sent numerous emails and faxes that gave bidding instructions to Yokohama regarding upcoming jobs, which led to additional price-fixing, bid-rigging and market allocation by Yokohama and the other co-conspirators during that period.   Code designations were devised by the conspirators to refer to each other in communications.   For example, Dunlop was referred to as "B1" and Trelleborg was referred to as "B2."   The conspirators also referred to themselves as "the club" or "the Technical Committee – Marine Hose."

230.   The foregoing documents made clear that Dunlop and Trelleborg were still participating in the scheme up through at least 2006 along with Yokohama and others. Trelleborg's website also indicates that Mr. Cognard was Trelleborg Industrie's Oil & Marine manager through at least April 2007.

231.   On or about May 1, 2007, another meeting was held amongst the conspirators in Houston, Texas.   The meeting was planned at this location, because the Offshore Technology Conference ("OTC") was being held in Houston, Texas from April 30 to May 3, 2007, and the corporate participants in the hose scheme are regularly represented at the OTC.

232.   The May 1, 2007 meeting was monitored by the Defense Criminal Investigative Service and the FBI.   Participants at the meeting included Whittle, Scaglia, Caleca, another representative of Trelleborg who reports to Caleca, executives from Yokohama, and other co-conspirators.   Relator is informed and believes that Brammar and Allison attended as well.   The coordinator Whittle discussed at the meeting, amongst other things, how prices were higher as a result of the conspiracy and how those high prices could be maintained by the conspirators.   Mr. Caleca and the other conspirators discussed how to improve their communications and make those communications more secure.   The conspirators also discussed the rules of their bid-

46

rigging/price-fixing/market allocation scheme, including the need for conspirators not to bid on projects already designated by the coordinator for a particular conspirator.

233.   On May 2, 2007, acting on information learned from its investigation into the foregoing hose scheme, the United States served arrest warrants on members of the hose scheme for violation of the Sherman Act, 15 U.S.C. § 1.   Criminal complaints were unsealed on or about the same date, which described the particulars of the hose scheme and identified many of the participants, but did not identify Yokohama.

Sample Sale to the United States

234.   On or about September 30, 2002, the United States awarded a contract to Manuli Oil and Marine for Petroleum Production and Distribution Equipment.  Relator is informed and believes this contract was for marine hose and was impacted by the hose scheme described herein among the defendants referenced as participating in the hose scheme.  The Procurement Instrument ID associated with the contract is F0560402C0013.  The contract value was $353,286.  The United States paid and Manuli received payment from the United States on this contract.

235.   As noted above, certain of the details alleged above regarding the hose scheme were derived from the Government's criminal complaints and other filings, but relator alleged and reported the existence of a price-fixing/market allocation/bid-rigging scheme involving marine products prior to the Government's disclosures, and relator had identified Trelleborg and Yokahama, among others, as participants in the scheme prior to the Government's disclosures. Relator also had previously identified the central figure Peter Nilsson, who headed TES for much of the period relevant to this complaint, and who directed and controlled the same pattern of wrongful conduct by both TEP and Trelleborg Industrie.  The hose scheme was thus simply part of a larger pattern of misconduct by Trelleborg and others in the marine product industry.

236.   During the period 1999 through 2007, the hose scheme caused the United States to pay substantially increased prices for marine hoses in amounts cumulatively estimated to be in the millions of dollars.  Relator is informed and believes that the States of California and Florida were also damaged by the scheme during the same period and in the same manner.

47

## IX.  CONTINUATION OF BUSINESS/DE FACTO MERGER

237.    At least two persons who were officers of SHI became officers of TEP.  Robert Taylor was president of SII and SHI, and he became president of TEP after Trelleborg acquired Seaward's operations.  Donald Murray was CFO of Seaward then moved into a similar position at TEP after the acquisition.   Both Taylor and Murray also became members of TEP's board and served as such during the period relevant to this complaint following the acquisition.  Through these means and others, TEP and Trelleborg were aware of the bid-rigging/price-fixing/market allocation scheme in place at Seaward, along with the potential liability it created, prior to the acquisition of Seaward's assets by Trelleborg.   After the acquisition, there were no major changes in the operation of the business.  There was thus substantial continuity in the operation of the business after Trelleborg acquired the operation from Seaward.

238.    Relator is further informed and believes that the transaction by which Trelleborg acquired SHI's assets amounted to a defacto merger.  Relator is informed and believes that inadequate consideration was paid by Trelleborg for the assets of Seaward.

239.    Trelleborg should be held liable for not just the conduct of TEP, Fentek, and Trelleborg Industrie, but Trelleborg, along with TEP (aka Virginia Harbor Services), should also be held jointly liable for the pre-acquisition liabilities of Seaward.

240.    Relator is informed and believes that the parent entities referenced herein directed and controlled the actions of the subsidiary entities that were directly or indirectly owned by them.

### COUNT I

(Submission of False Claims in Violation of 31 U.S.C. § 3729(a)(1))
(All Defendants)

241.    Relator realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

242.    By engaging in the conduct described herein, defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States in violation of 31 U.S.C.

§ 3729(a)(1). Defendants presented false or fraudulent claims to the United States for payment and approval.

243.    As a result of the defendants' conduct, the United States has suffered damages in an amount to be shown according to proof at trial.

## COUNT II

(Use of False Statements or Records or Statements
in Violation of 31 U.S.C. § 3729(a)(2))
(All Defendants)

244.    Relator realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

245.    By engaging in the conduct described herein, defendants knowingly submitted, or caused to be submitted, false records and/or statements to the United States in violation of 31 U.S.C. § 3729(a)(1).

246.    Defendants knowingly made or used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act.

247.    As a result of the defendants' conduct, the United States has suffered damages in an amount to be shown according to proof at trial.

## COUNT III

(Conspiracy to Get False Claims Paid - 31 U.S.C. § 3729(a)(3))
(All defendants)

248.    Relator realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

249.    As described in more detail above, each of the defendants independently and knowingly agreed to participate in one or more of the unlawful schemes described herein and took affirmative steps to advance the conspiracy to execute the scheme.

250.    Defendants thus knowingly conspired to defraud the United States by getting false claims paid in violation of the False Claims Act.

251.    As a result of the defendants' conduct, the United States has suffered damages in an amount to be shown according to proof at trial.

## COUNT IV
(Submission of False Claims -- Violation of California Government Code Section 12651(a)(1))
(All Defendants)

252.    Relator realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

253.    By engaging in the conduct described herein, defendants knowingly submitted, or caused to be submitted, false claims for payment to State and Local Government Entities in the State of California in violation of the California False Claims Act.  Defendants presented false or fraudulent claims to such entities for payment and approval.

254.    As a result of the defendants' conduct, State and Local Government Entities within California have suffered damages in an amount to be shown according to proof at trial.

## COUNT V
(Use of False Statements or Records -- California Government Code Section 12651(a)(2))
(All Defendants)

255.    Relator realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

256.    By engaging in the conduct described herein, defendants knowingly submitted, or caused to be submitted, false records and/or statements to the State of California in violation of the California False Claims Act.

257.    Defendants knowingly made or used false records or statements to get false or fraudulent claims paid or approved by State and Local Government Entities in the State of California in violation of the California False Claims Act.

258.    As a result of the defendants' conduct, State and Local Government Entities within California have suffered damages in an amount to be shown according to proof at trial.